**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SPIRE, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 17-00266-KD-N** |
| | ) | |
| **CELLULAR SOUTH, INC.,** | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on Defendant Cellular South, Inc.'s Rule 65 motion for preliminary injunction (Docs. 29, 30, 44), Plaintiff Spire, Inc.'s Opposition (Docs. 33, 43), the August 30-31, 2017 evidentiary hearing,[1] and the parties post-hearing briefs (Docs. 59, 60).

### I.    Background

### A.    Procedural

On June 14, 2017, Plaintiff Spire, Inc. (Spire -- a provider of natural gas fueling services)[2] initiated this action against Cellular South, Inc. (C SPIRE – a wireless telecommunications business that also provides television and internet services)[3] to address matters of confusion and dilution

---

1 Including the exhibits admitted at the hearing and the testimony of the parties' witnesses (Suzie Hayes (Senior Vice-President of Consumer Markets for Cellular South) and Rhonda Jane Harper (research and legal consultant – expert in consumer research and branding) for Defendant; Jessica Willingham (Vice-President Corporate Communications and Marketing for Spire) and Jacob Jacoby, Ph.D. (expert in trademark survey research and branding (consumer perception)) for Plaintiff).

2 Per the Complaint, "Spire is a public utility holding company whose primary business is to own and operate utility subsidiaries that provide the safe and reliable delivery of natural gas service to customers across Alabama, Mississippi, and Missouri." (Doc. 1 at 4 at ¶8). Spire is the 5th largest publicly traded natural gas company in the United States, serves more than 1.7 million residential, commercial and industrial customers in Alabama, Mississippi and Missouri, and through subsidiaries and predecessors in interests traces its history back more than 180 years to Mobile Gas, Alabama Gas Corporation and the Laclede Gas Light Company. (Id. at 6).

3 Per the Complaint, "Cellular South's primary business is wireless telecommunications...also provides other telecommunication goods and services, including television and internet services. (Doc. 1 at 4 at ¶11). Cellular South was incorporated in 1984 and offers a comprehensive suite of wireless and fiber-based communications products and services (including high speed internet) as well as cloud services. (Doc. 30 at 4).

between the companies' trademarks which emerged as part of Spire's rebranding of its businesses.[4]
Specifically, Spire filed a declaratory judgment action asking the Court to declare that it is not
infringing on Cellular South's trademarks (C SPIRE, etc), that there is no confusion between each
company's trademarks, and that Cellular South lacked any basis for issuing a March 2016 cease and
desist letter to Spire.  (Doc. 1).  As relief, Spire seeks a judgment from the Court that its use of the
marks does not infringe or violate any trademark rights of Cellular South; that it is entitled to register
the marks with the USPTO; a judgment cancelling or preventing registration of certain new C SPIRE
marks pursuant to 15 U.S.C. § 1064(3) and/or 15 U.S.C. § 1119; Section 1120 damages; costs; and a
finding that this is a Section 1117 exceptional case, awarding attorneys' fees to Spire.

On July 6, 2017, Cellular South filed an answer, and asserted five (5) counterclaims for
federal trademark infringement (Count I), federal unfair competition (Count II), common law
trademark infringement and unfair competition (Count III), state trademark dilution (Count IV) and a
declaratory judgment (Count V), relying on the *Federal Trademark Act of 1946*, 15 U.S.C. § 1051 *et
seq*. (the Lanham Act) and Mississippi and Alabama law.  (Doc. 8).  On July 27, 2017 Spire filed an
amended complaint, asserting two (2) cause of action: 1) a declaration as to non-infringement, non-
dilution and registrability (that there is no likelihood of confusion and/or dilution); and 2)
cancellation and prevention of registration of Cellular South's trademarks and civil liability under 15
U.S.C. § 1064(3), 1119 and 1120.  (Doc. 19).  On August 10, 2017, Cellular South filed an answer to
Spire's amended complaint.  (Doc. 26).

On August 14, 2017, Cellular South filed a Rule 65(b) motion for entry of a temporary
restraining order and injunction against Spire.[5]  (Doc. 30). Cellular South seeks a finding by this

---

4 The parties have been disputing these issues before the United States Patent & Trademark Office (USPTO) since April 2016.

5 At that time the parties had been litigating this case since mid-June, had received notice of the motion and were represented by counsel, and had already submitted briefing on the motion with further briefing ordered. The Court thus determined the motion should be treated as one for a preliminary injunction. <u>Burk v. Augusta-Richmond Cty.</u>, 365 F.3d

Court that there is a likelihood of confusion among consumers as to the marks, that Spire's use of the marks has infringed or will infringe on Cellular South's marks, that Spire's use of the marks constitutes or will constitute unfair competition, unfair trade practices or deception, that Spire's use of marks has diluted or will dilute Cellular South's marks under Alabama and Mississippi law, and that pursuant to 15 U.S.C. § 1052(a) and (d) Spire's marks should not be registered.  Cellular South seeks a preliminary and permanent injunction prohibiting Spire from using the marks (or any confusingly similar version) as a source identifier for the goods and services identified in Spire's applications or any other related goods and services – focused currently on Spire's recent rebranding and marketing efforts.

**B.** **Factual Timeline**[6]

9/20/11:      Cellular South begins doing business "under one or more of the C SPIRE Marks" to rebrand itself as C SPIRE (Doc. 8 at 21; TR II 139 (Hayes and Hrg. Ex. D-4). This brand launch takes time and costs approximately $12.8 million (Hr. Ex. D1-**SEALED**). Cellular South has spent approximately $275 million on marketing since 2011 (including $140 million in MS and $18 million in AL). (Hrg. Ex. D-2, D-3 **SEALED**)

2012:           The Laclede Group, Inc. started looking at rebranding, name development etc. TR II 91-92 (Willingham). Laclede chose the name Spire in 2012. Id. at 94 (Willingham).

9/27/12:       Laclede ordered a trademark search. TR II 94-95 (Willingham and Hrg. Ex. P-Z). Laclede did not find any company confusion and not identify any competitors, etc. Id. Looked for competitors in business line (goods/services class). Id. at 97. Comprehensive search was 455 pages and C SPIRE not show up at all. Id. at 99. Laclede did not know the company existed. Id. at 93-94 (Willingham).

11/9/12:       Laclede began using Spire mark for its natural gas stations. TR II 186.

1/20/13:       LXE, LLC (subsidiary of Honeywell Intl.) entered into a consent agreement with Cellular South in which it was agreed that the word mark Spire was not confusing as used in the relative market.  Honeywell sold antennas for infrastructure, not to consumers. TR. 79 (Hayes) Honeywell (via LXE and now subsidiary Hand Held Products, Inc.) owns/uses #2534546 Spire for antennas for wireless communications.

12/23/13:      Laclede continues using word mark Spire for natural gas vehicle fueling services. TR

---

1247, 1262 (11th Cir. 2004).

6 This timeline is derived from the Complaints and hearing testimony and exhibits. Records cites are as follows: TR (August 30th testimony) and TR II (August 31st testimony).

II 83, 139, 222-223 (Willingham). The mark is displayed in a combination of gray, blue and white. TR II 223 (Willingham).

Feb. 2014:      Laclede's began rebranding all companies under its umbrella to Spire. TR II 89-90 (Willingham).

6/10/14:      Laclede registers Spire mark for fueling stations. TR II 83, 141, 142 (Willingham and Hrg. Ex. D-11F). Used on 2 stations- SC and MO - not in MS or AL. Id. Also used on a nationwide website. Id. (Principal Register (#4548479) by Laclede).

Sept. 2014:      Laclede acquires Alabama Gas Corporation (Alagascorp).

12/2/14:      Cellular South applies for trademark for C SPIRE Home.  (Hrg. Ex. D-5).

6/10/15:      Laclede conducts another trademark search; 596 pages resulted. TR II 101-103, 220 (Willingham and Hrg. Ex P-AA). C SPIRE was identified in this search. Id. C SPIRE not in same business so believed to be irrelevant to Laclede.  Id.  The results show over 150 active registrations for spire, including 18 in MS and 15 in AL. Id.

8/11/15:      Laclede conducts another trademark search; 275 pages resulted. TR II 106-107 (Willingham and Hrg. Ex P-BB).

9/9/15:      Laclede applied to USPTO to register SPIRE INC #86751779. (Hrg. Ex. D-11A).

2016:      Laclede began "master rebranding" campaign. TR II 142, 144, 186 (Willingham and Hrg. Ex. D-11A and D-11B). Spire began rebranding most of its operations under spire brand name. (Doc. 1 at 7). Spire uses the marks for promoting, offering and rendering natural gas marketing/fueling in AL, MS, MO and SC.

1/4/16:      Laclede applications ##86864712, 86864729, 86864721. (Hrg. Ex. D-11B-D)

3/24/16:      Laclede issues press release about the name change to Spire, Inc. TR II 144, 157, 158 (Willingham). Rebranding covered by Al.com and Birmingham Business Journal.  Id. at 122.

3/28/16:      Cellular South sends a cease and desist letter to Laclede. TR II 117-118 (Willingham); Hrg. Ex. P-R.  Cellular South asserts that Spire's trademarks infringed/diluted CSPIRES trademarks (Doc. 1-2).  Cellular South complains about Spire's use of mark and damage and or potential damage.

April 2016:   Laclede officially and formally changes name to Spire Inc.  TR II 129, 131 (Willingham).  Prior to April 27, 2016 Cellular South was not aware that the Spire brand launch had already occurred. TR 104 (Hayes).

4/1/16:      Spire responded to Cellular South, and told them it had been using spire mark since December 2013.  TR II 118-119 (Willingham); Hrg. Ex. P-I.

4/27/16:      Cellular South files Opposition to Spire's mark registration in the USPTO. Opposition (#91227574) pending. Hrg. Ex. P-J.

4

4/28/16:       Laclede shareholders approve new name/logo. TR II 122 (Willingham).

4/29/16:       Spire launched new Spire website, changed NYSE ticker symbol to Spire, and all employee email were changed to Spire.  TR II 122 (Willingham).

June-Aug. 2016:       Cellular South files Opposition to Spire's trademark application ##86864712, 86864729, 86864721. Opposition #91229269. Oppositions # 91227574 and 91229269 consolidated before USPTO as #91227574.  In Opposition. Cellular South claims likelihood of confusion, diluting by blurring, false suggestion of a connection/disparagement. Hrg. Ex. P-L and P-M.

8/29/16:       Spire submitted answer to Cellular South in USPTO, reaffirmed rebranding. TR II 126-127 (Willingham).

Sept. 2016     Spire acquires Mobile Gas.

Dec. 2016:     Spire annual report issues.  TR II 129-130 (Willingham). Proclaimed self as Spire in MS, worldwide, webpage, etc. Id. Hrg. Ex. P-O.

2/21/17:       Spire submits interrogatory response to Cellular South before the USPTO, again stating its rebranding process continues and noting completion expected by end of 2017. TR II 128-129 (Willingham and Hrg. Ex. P-N).

4/17/17:       Cellular South withdraws dilution by blurring claims before USPTO.

7/27/17:       Spire submits materials to Mississippi public service utilities commission with specific timelines.  TR II 158-159, 161-162 (Willingham). Shows launch date 8/30/17. Id. (Hrg. Ex. D-20).

Aug. 2017:     Spire's rebranding continues. TR II 162 (Willingham).  Spire has communicated to the Willmut, Mobile Gas and Alagascorp customers about becoming Spire. Id. All employees while not yet wearing new uniforms, are wearing Spire hats, Spire ID badges, and signage transition has already begun (vehicle fleet started last week as part of an 8 week process). Id.

## II.    **Burden of Proof**

Cellular South asserts five (5) counterclaims for: 1) federal trademark infringement, 15 U.S.C. § 1114 (Count I); 2) federal unfair competition, Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); 3) common law trademark infringement and unfair competition (Count III); 4) Mississippi and Alabama state trademark dilution (Count IV); and 5) a declaratory judgment (Count V).  Cellular South requests injunctive relief against Spire and thus bears the burden of proving entitlement to such relief.

III.    **Lanham Act & Preliminary Injunction**

The Lanham Act prohibits the unauthorized use of a registered trademark in connection with "the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a).  The Act confers the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered" in the USPTO. 15 U.S.C. § 1116(a).  Nevertheless, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009). The four (4) prerequisites are: 1) a substantial likelihood of success on the merits; 2) irreparable injury/harm will be suffered unless the injunction issues; 3) threatened injury to the movant outweighs whatever damage/harm the proposed injunction may cause the non-movant; and 4) the injunction would not be adverse to the public interest.  FF Cosmetics FL, Inc. v. City of Miami Beach, 2017 WL 3431453, *4 (11th Cir. Aug. 10. 2017).  "Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits. *See, e.g., Schiavo*, 403 F.3d at 1226 n. 2, 1237; *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir.1994); *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir.1987)."  Miami-Dade, 557 F.3d at 1198.  As a drastic remedy, "its grant is the exception rather than the rule[.]"  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).  "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).

According to Cellular South: 1) it adopted the mark C SPIRE long before (since September 2011) Spire began using the mark Spire; and 2) the Spire mark is likely to cause confusion or mistake or deceive the public as to affiliation, connection, origin, sponsorship or approval (trademark

infringement, unfair competition and dilution).  Cellular South relies on the testimony and reports of Rhonda Harper (expert in consumer research and branding) and Susie Hayes (V.P. of Consumer Markets for Cellular South) in support.

In contrast, according to Spire, it has been using the mark since December 2013 without any confusion. Spire also asserts that Cellular South cannot establish a substantial likelihood of success on the merits because the marks are not likely to be confused because: natural gas and telecommunications services are not closely related; the parties operate in different and unrelated industries with different products, channels of trade and consumers; and the colors, appearance and pronunciation of the marks differ.   Additionally, Spire highlights Cellular South's Consent Agreement with another entity in which: 1) Cellular South agreed that the marks used between them, which both share the word term "spire" and are both in the telecommunications field "can coexist in the marketplace without confusion, deception, or mistake to the relevant consumers[--]" representing such to the USPTO; and 2) Cellular South contractually limited its use of its C Spire marks to telecommunications goods/services which contradicts its current claims that Spire's natural gas services is within its "natural zone of expansion."  Spire also relies upon the report and testimony of Dr. Jacob Jacoby (expert in trademark research and branding) and testimony of Jessica Willingham (V.P. of Spire communications and marketing) in support.

**IV.**    **Substantial likelihood of success on the merits**

**A.**    **Federal/Common Law Trademark Infringement/Unfair Competition: Counts I, II**

As set forth in Choice Hotels Int'l v. Key Hotels of Atmore Ii, LLC, 2016 WL 6652453, *3 (S.D. Ala. Nov. 9, 2016): "Section 32(1) of the Lanham Act attaches liability for trademark infringement when a person 'use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' which 'is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).'"  "In order to prevail on a trademark infringement claim based on

a federally registered mark, 'the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive.'" Optimum Tech., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007).   Additionally, "[o]rdinarily, trademark infringement cases are predicated on the complaint that the defendant employed a trademark so similar to that of the plaintiff that the public will mistake the defendant's products for those of the plaintiff…The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement….." Burger King Corp. v Mason, 710 F.2d 1480, 1491-1492 (11th Cir. 1983) (internal citations omitted).

Moreover, the Lanham Act makes actionable the false designation and misleading use of marks, likely to confuse or deceive, to protect against unfair competition. 15 U.S.C. § 1125.  See also Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 (2003) (citing 15 U.S.C. § 1127). Section 43(a)(1)(A) creates a claim for any person injured by another's use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive" as to the origin of a product or service. 15 U.S.C. § 1125(a)(1)(A). To prevail, a trademark owner must establish: 1) trademark rights in a mark or name and 2) that the other party adopted a mark or name that was the same, or confusingly similar, such that consumers were likely to confuse the two. Fla. Int'l, 830 F.3d at 1265.  "While nearly identical to the likelihood-of-confusion standard…for federal trademark infringement claims, § 43(a) of the Lanham Act 'is broader ... in that it covers false advertising or description whether or not it involves trademark infringement.'"  Id.  However, a plaintiff must prove the same elements for unfair competition under 15 U.S.C. § 1125(a) as for a trademark infringement claim.  Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1346 (11th Cir. 2012).

In the Eleventh Circuit these two (2) federal claims are often assessed together because "the same facts that support a claim for trademark infringement are also sufficient to support a claim for

unfair competition…" Escot Bus Lines, LLC v. Florida Express Bus, LLC, 2017 WL 1005954, *3 (M.D. Fla. Mar. 15, 2017).  See also Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1475 n.3 (11th Cir. 1991) (noting same facts support trademark infringement and unfair competition); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Additionally, the "factors relevant to establishing likelihood of confusion relative to trademark infringement, are essentially the same factors relevant to establishing a likelihood of confusion with respect to...unfair competition...." Safeway Stores, Inc. v. Safeway Discount Drugs, 675 F.2d 1160, 1163-1164 (11th Cir. 1982); Tally–Ho, Inc. v. Coast Comm. College Dist., 889 F.2d 1018, 1025-1026 (11th Cir. 1989) (noting the elements are the same).

Further, this Court's analysis of Cellular South's Alabama and Mississippi common law trademark infringement counterclaims is the same as the analysis for the claims under federal law. Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1521 (11th Cir. 1991); Alfa Corp. v. Alfa Mortg., Inc. 560 F.Supp.2d 1166, 1175 (M.D. Ala. 2008); Git-R-Done Prod., Inc. v. Giterdone C Store, LLC, 226 F.Supp.3d 684, 691 (S.D. Miss 2016).   The same holds true for Cellular South's Mississippi common law unfair competition counterclaim.[7]  Git-R-Done, 226 F.Supp.3d at 691; Powertrain Inc. v. American Honda Motor Co., Inc., 2007 WL 2254346, *2 (N.D. Miss. Aug. 2, 2007).

For the federal and common law trademark infringement counterclaims and the federal and Mississippi unfair competition counterclaims, Cellular South must establish: 1) it has a valid mark; and 2) Spire's use of the contested mark is likely to cause confusion. Dieter v. B&H Indus. of Sw. Fla., Inc., 880 F.2d 322 (11th Cir. 1989).  The parties do not dispute Cellular South's "C SPIRE" is a valid federally registered mark.  Whether there is a likelihood of consumer confusion depends on

---

[7] However, this Court's analysis of Cellular South's Alabama common law unfair competition counterclaim differs. Notably, "Alabama does not recognize a common-law tort of unfair competition[]" and the undersigned will not *sua sponte* craft a viable counterclaim for Cellular South from the facts alleged.  Alfa Corp. 560 F.Supp.2d at 1175; Way Int'l v. Church of the Way Int'l, 2017 WL 432456, *9 (N.D. Ala. Feb. 1, 2017). As such, Cellular South's Alabama common law unfair competition claim is **DISMISSED**.

seven (7) factors: 1) the distinctiveness of the mark alleged to have been infringed; 2) similarity of the infringed and infringing marks; 3) similarity between the goods and services offered under the two marks; 4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; 5) similarity of advertising methods; 6) intent of the alleged infringer to misappropriate the proprietor's good will; and 7) the existence and extent of actual confusion in the consuming public.  Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1360 (11th Cir. 2007); Conagra v. Singleton, Inc., 743 F.2d 1508, 1514 (11th Cir. 1984). "Of the seven factors, the type of mark and the evidence of actual confusion are the most important."  Caliber Aut. Liq., Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 935 (11th Cir. 2010); Dieter, 880 F.2d at 326.

### 1.    Distinctiveness of Mark

Trademark protection is only available to "distinctive" marks (marks capable of distinguishing the owner's goods from others), Two Pesos, 505 U.S. at 768-769, as "marks that serve the purpose of identifying the source of the goods or services[.]"  Forman, 509 F.3d at 1357.  A mark is distinctive and thus capable of trademark protection based on whether it has inherent or acquired distinctiveness through secondary meaning.  Id.  "A plaintiff has a protectable interest in a mark if the mark is inherently distinctive…If the mark is not inherently distinctive, a plaintiff can obtain rights in the mark only if the mark acquires secondary meaning…" Donut Joe's, Inc. v. Interveston Food Servs., LLC, 101 F.Supp.3d 1172, 1181 (N.D. Ala. 2015).   There are four (4) levels of "distinctiveness" listed from weakest to strongest: 1) generic (marks that suggest the basic nature of the product or service); 2) descriptive (marks identify the characteristic or quality of a product or service); 3) suggestive (marks that suggest characteristics of the product or service and require an effort or "leap" of the imagination by the consumer to be understood as descriptive "to get from the mark to the product"); and 4) arbitrary or fanciful (marks that bear no relationship to the product or service, the strongest category).  Tana v. Dantanna's, 611 F.3d 767, 774 (11th Cir. 2010); Caliber, 605

F.3d at 939; Gift of Learning Found, Inc. v. TCG, Inc., 329 F.3d 792, 797-798 (11th Cir. 2003).  See

generally Forman, 509 F.3d at 1357-1358; John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966,

975 (11th Cir. 1983); Belen Jesuit Prep. School, Inc. v. Sportswear, Inc., 2016 WL 4718162, *8 (S.D.

Fla. May 3, 2016). Courts must determine whether the mark is strong or weak in order to determine

the level of protection to be extended to the mark. Harland, 711 F.2d at 973. Strong marks are given

strong protection over a wide range of related products and services. Id. "[T]he rationale is that the

more well-known the mark, the deeper is the impression it creates upon the public's consciousness

and the greater the scope of protection to which it is entitled." Turner Greenberg Assoc., Inc. v. C&C

Imports, Inc., 320 F.Supp.2d 1317, 1332 (S.D. Fla. 2004) (citing Freedom Savings & Loan Assn. v.

Way, 757 F.2d 1176, 1182 (11th Cir. 1985)). The Eleventh Circuit also considers third party use of

the same or similar mark, when assessing a mark's strength.  Harland, 711 F.2d at 974-975 (citing

cases stating that "[a] strong trademark is one that is rarely used by parties other than the owner of the

trademark, while a weak trademark is one that is often used by other parties[]").

Cellular South contends that the "C SPIRE" mark is strong because it is "arbitrary" (and

famous or well-known), and while there are third-party uses of "spire," none involve publicly traded

companies coming directly into Cellular South's "footprint," using identical logos, selling home and

telecommunication services, and marketing goods and services to the same consumers.  (Doc. 30).

At the evidentiary hearing, Hayes testified to the well known brand recognition of C SPIRE, citing

2016 and 2017 market surveys for Mississippi indicating C SPIRE has a "high brand preference" and

the general health of the brand is "very strong," with 88% brand awareness in that State. (Hrg. Ex. D-

9, D-10; TR 20-23, 25, 68, 69-70 (Hayes)).  Per Hayes, the surveys place C SPIRE "on par" with

AT&T and Verizon in terms of recognition such that the C SPIRE mark is "famous." Id.  Hayes

testified that C SPIRE became known through marketing efforts, but by the November 11, 2011

launch of the IPhone, the mark was well known.  (TR 69-70 (Hayes)).  Cellular South adds that it has

built a strong reputation for high quality goods and services under the C SPIRE mark with extensive advertising and sales such that its mark is well known and distinctive with enormous value and widespread recognition.

According to Spire, Cellular South's mark is not "famous," is only "suggestive," as it suggests characteristics of the goods and services provided, and extensive third party use of "spire" has caused dilution (e.g., more than 150 active federal trademark registrations and applications in the USPTO's database with trademarks using the term "spire", 14 entities in Alabama which incorporate "spire" into their name, and 8 entities in Mississippi that incorporate "spire" into their name)) such that C SPIRE is not entitled to protection as a strong trademark.  See, e.g., Fla. In'tl, 830 F.3d at 1257-1258; Donut Joe's, 101 F.Supp.3d at 1185; Alltel Corp. v. Actel Integ. Comm. Inc., 42 F.Supp.2d 1265, 1271 (S.D. Ala. 1999).  Spire also references Cellular South's Consent Agreement with a third party, as underscoring the "weak" nature of the mark.

The evidence supports a finding that in the State of Mississippi, Cellular South's C SPIRE mark is at least "well known."  Cellular South has presented no evidence to the Court of its marks' distinctiveness in any other state, including Alabama.  In contrast, Spire has submitted significant evidence of the use of the term "spire" being heavily diluted nationwide. Upon consideration, the Court finds that Cellular South has not established a substantial likelihood of showing that its mark is arbitrary and thus entitled to the highest protection.

### 2.    Similarity between Marks

Similarity is determined by considering the "overall impression created by the marks, including a comparison of the appearance, sound, and meaning of the marks, as well as the manner in which they are displayed." E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1531 (11th Cir. 1985).

Cellular South contends the marks are "nearly identical in appearance, sound, connotation and

commercial impression[]" which is "most obvious when" viewed side-by-side, and in light of the Harper survey (37% rate of confusion).  (Doc. 30).  Cellular South claims the marks are similar in font, kerning or spacing and type face and the only difference on some of the marks is that there is a "C" in front of the Cellular South mark versus a double "C" or a hidden "S" or a handshake in some of Spire's marks.  (TR 15, 47-50, 53-55, 74 (Hayes); TR II 225-226; Hrg. Ex. D-12 and D-24 (style guides),; Hrg. Ex. D-13).  At the evidentiary hearing Hayes testified that Cellular South's logo will be confused with Spire's logo because "the average consumer driving down the road at 55 miles per hour seeing a billboard will likely think Cellular South altered its logo and changed its color to orange." TR 55 (Hayes).  Cellular South also relies on Harper's summation that after viewing the two company's websites, the companies use the word spire virtually identically in font, kerning and impression. (Hrg. Ex. D-40).

In contrast, Spire contends that a comparison of its marks based on "the appearance, sound and meaning of the marks, as well as the manner in which the marks are used[]" Fla. Int'l, 830 F.3d at 1260, emphasizes the dissimilarities and shows they are distinguishable, particularly when examined as encountered in the real world (sequentially not necessarily "side by side").  Custom Mfg. and Eng. Inc., v. Midway Servs., Inc., 508 F.3d 641, 652 (11th Cir. 2007) ("[we reject such a theory of infringement in a vacuum, as liability under the Lanham Act is properly tied to the real-world context in which the alleged trademark use occurs. *Cf. Homeowners Group, Inc.,* 931 F.2d at 1106 (noting that the likelihood-of-confusion inquiry must consider "the operative facts of the real world" and "the performance of the marks in the commercial context," and cautioning that the "appearance of the litigated marks side by side in the courtroom does not accurately portray actual market conditions") (internal quotation marks and citation omitted). Like the proverbial tree falling in a forest, the unauthorized use of a trademark that is never perceived by anyone cannot be said to create a likelihood of consumer confusion.)[]").

For appearance, Spire's mark is orange, with block lettering in a specific font, and has a symbol after the lettering (two staggered semi-circles, representing a handshake). Cellular South's mark is blue, with rounded lettering in a different font, and has a symbol before the lettering (a "c" with beams of varying lengths surrounding it). For sound, they are pronounced differently: one versus two syllables, and one using "c" while the other does not. The Court notes as well, that Cellular South has made prior representations to the USPTO (Honeywell agreement) that its use of the letter "c" in its logo sufficiently distinguishes it from another third-party mark that also uses the word "spire" in their mark.[8]

Upon consideration, the only identical aspect of each company's logo is the logo's incorporation of the same word, "spire." Otherwise, the colors are different, fonts are different (although only slightly), spacing is somewhat different, and the art (C with rays versus handshake) is different (style, placement and color). While, at a quick glance, the spacing of the letters and same use of the word "spire" may make them appear similar, the Court concludes that the overall impression created by the appearance, sound and meaning of the marks are distinguishable. This factor weighs *slightly* in Cellular South's favor.

### 3.    Similarity between Products and Services

For this factor courts assess whether the products and services "are the kind that the public attributes to a single source, not whether….the purchasing public can readily distinguish between" them. Caliber, 605 F.3d at 939-940; Fla. Int'l, 830 F.3d at 1261. Namely, whether the products and services sold under the competing marks are "so related in the minds of consumers that they get the sense that a single producer is likely to put out both." Fla. Int'l, 830 F.3d at 1261.

Cellular South contends that the goods and services identified in Spire's mark applications

---

8  The court recognizes that the context in which Cellular South made the representation is distinguishable from the facts of this case. In the agreement with Honeywell it was clear that Cellular South's opinion was that "spire" and "C Spire" would not be confused in **the relevant market**. At trial Cellular South presented testimony that the relevant market for Honeywell was businesses involved in infrastructure, not common consumers.

(the "classes") are "overlapping or highly related to the goods and services" it provides and "fall within the natural zone of expansion" (*apparently in the future*) of Cellular South's goods and services.  (Doc. 30 at 18).  As illustration, Cellular South asserts that it provides local and long distance transmission of telecommunications, and "similarly," Spire offers local and long distance transmission of gas.  (Id.)  Per Cellular South: "someone may move into a new home or office and need to set up phone, internet, television and gas. In that case, he or she could call C Spire for the first three and Spire for the last. The potential for confusion is obvious." (Id. at 19).

At the evidentiary hearing, Hayes summarized Cellular South's position: these are both goods or services "you utilize in your home."  TR 99 (Hayes).  Hayes explained that Cellular South's position is rooted on its future "road map" and "plans" to "own the household" by branching out into lighting controls, thermostats, $CO_2$ detectors, etc. for the household, and based on that potential new direction of its business, claiming similarity of products. TR. 11, 13, 27, 30-32, 43-45, 76, 99 (Hayes).  Hayes testified that Cellular South is a utility like Spire, and that their method of delivery is the same as Cellular South has 7,000 miles of fiber cable underground and Spire supplies natural gas through underground pipelines.  TR 13, 31-32, 43, 45 (Hayes). Cellular South thus blankets the similarity of products and services under a "utilities" umbrella – both are utilities and regulated by the Public Service Commission.  TR II 226.

Put simply, the parties are not competitors (with the possible exception that they both might sell $CO_2$ monitors in the future).   Spire's natural gas energy services are distinct and unrelated to Cellular South's telecommunication goods and services.  Hayes testified that Cellular South does not distribute or sell natural gas or oil and has no plans to do so in the future.  TR 76, 81 (Hayes). Similarly, Harper testified that Cellular South and Spire do not compete against each other.  TR 181 (Harper). Additionally, as Cellular South asserted to the USPTO, its buyers sign up for phone or computer services not "by mistake" nor "without full knowledge as to the source of those services."

This fact alone minimizes the likelihood of confusion with the Spire marks.

There is also not evidence of actual confusion.  Willingham testified that she is not aware of any actual confusion with the Spire mark from its first use in December 2013 through the present date with *any* business, including Cellular South.  TR II 84, 120 (Willingham).  Also, Dr. Jacoby's testimony and findings indicate that it is highly unlikely that any consumers seeking telecommunications services would call a natural gas company for such services, or think that one is linked with the other – noting only 2.7% of consumers *may* think the businesses could be associated. TR II 9, 12 (Jacoby).

Further, case law provides that when the products and services are not related, confusion is less likely.

> "The greater the similarity between the products and services, the greater the likelihood of confusion. John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 976 (11th Cir.1983); see also Therma–Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 632 (6th Cir.2002) (*if the goods or services are totally unrelated, confusion is unlikely*; if the goods or services are somewhat related but not competitive, the likelihood of confusion turns on other factors). *The use of similar marks does not constitute infringement if the products at issue are unrelated*. Walter v. Mattel, Inc., 210 F.3d 1108, 1111 (9th Cir.2000) (no likelihood of confusion between commercial illustrator using the name "Pearl Beach" and toy company's "Pearl Beach Barbie" product); Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 557 (10th Cir.1998) (*no likelihood of confusion where marks were same word but visually distinct, parties were not competitors*, products were geared toward distinct populations, defendant's services were very expensive, the purchase of which required an especially high degree of sophistication and care, and plaintiff presented little evidence of actual confusion).

HBP, Inc. v. American Marine Holdings, Inc., 290 F.Supp.2d 1320, 1332, 1334-1335 (M.D. Fla. 2003) (citing and discussing cases which found there was no likelihood of confusion because the trademarks were for products were sold in different industries, including the case of General Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 722, 727-728, 833 (W.D. Mich. 1964) (discussing Cadillac cars versus Cadillac boats and rejecting plaintiff's theory that "public confusion automatically follows the use of the trademark 'Cadillac' upon any other product, no matter how unrelated it may be to Cadillac automobiles" and holding "[w]hile Cadillac cars and defendant's

Cadillac boats are means for transportation....they do not possess the same descriptive properties....This differential makes them void of inherent confusing characteristics."….)).

Case law also suggests that *direct* or *actual competition* with the same or similar goods/services is required for an infringement claim to survive.  For example, in as the Eleventh Circuit explained in Tally–Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018 (11th Cir. 1989), an infringement action is based on the likelihood of consumer confusion between suppliers of *competing goods*. Id. at 1024. "It is critical to note the distinction between a trademark infringement action and a trademark dilution action. At common law, a trademark was intended to differentiate between different sources of *competing goods.* Thus, *an infringement* action is based on the likelihood of consumer *confusion between suppliers of competing* goods in the same geographic locale..."  See also e.g., Peoplelink, LLC v. Birmingham Personnel Servs., Inc., 2015 WL 3966258, *8 (N.D. Ala. Jun. 30, 2015) ("[]n an infringement action, the plaintiff must initially demonstrate…actual…product competition with the alleged infringer[]" (citing Tally-Ho)); Little League Baseball, Inc. v. Kaplan, 2009 WL 10668763, *7 (S.D. Fla. Mar. 3, 2009) (differentiating trademark infringement and dilution claims noting that dilution occurs "where companies produce different goods or services and where there is no likelihood of consumer confusion between the two marks…In this way, dilution claims are different from infringement claims[]"); Whitney Info. Network, Inc. v. Xcentric Ventures, LLC, 2005 WL 1677256, *4 (M.D. Fla. Jul. 14, 2005), *vacated and remanded on other ground*s by Whitney, 199 Fed. Appx. 738 (11th Cir. 2006) ("[t]o state a valid common law claim for trademark infringement....the plaintiff must also show actual or intended competition....Defendants do not sell similar products as those of the Plaintiffs.....Consequently, the Plaintiffs have failed to state a claim upon which relief can be granted on common law trademark infringement[]"); EBSCO Indus., Inc. v. LMN Enterp., Inc., 89 F.Supp.2d 1248, 1263 at note 22 (N.D. Ala. 2000) ("As the Eleventh Circuit explained in *Tally–Ho*...an infringement action is based on the likelihood of consumer confusion

17

between suppliers of competing good[]").

And notably, with regard to Cellular South's "zone of natural expansion" argument, "the senior user of a mark cannot monopolize markets that *neither his trade nor his reputation has reached.*" Tally-Ho, 889 F.2d at 1027-1028 (citing J. McCarthy…§ 26:1, at 284) (emphasis added). The "zone of natural expansion" doctrine provides the senior user with only "some *limited* 'breathing space' in which *to expand beyond its current actual use.*" J. McCarthy…§ 26:8, at 302." Id. at 1028 (emphasis added).

Finally, Cellular South suggests customer service confusion and inconvenience in calling one company when trying to reach the other.  (Doc. 30 at 20).  No evidence of customer service issues was submitted to the Court, only speculation.  Thus, this argument is unpersuasive. Delta Air Lines, Inc. v. Wunder, 2015 WL 11347586, *13 (N.D. Ga. Dec. 28, 2015) (finding "no evidence to support any actual customer confusion. Thus, this factors weighs in the ....[non-movant's] favor[]").  *Cf.* Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1508 (11th Cir. 1985) (inquiries from "an undetermined number of potential customers" held to be "no clear evidence" of actual confusion);

In sum, the Court finds the products and services are similar in only one way; the products are both utilities delivered underground (method of delivery or transmission).  Otherwise the products are distinguishable.  This factor does not weigh in favor of Cellular South.

### 4.    Sales Methods

Similarity of sales methods is assessed with reference to the similarity of customers and sales outlets between the entities, Tana, 611 F.3d at 778, and "where, how and to whom the parties' products are sold[,]" Fla. Int'l, 830 F.3d at 1261.  "The likelihood of confusion is reduced when the goods of the parties are sold to different classes of buyers through different channels of distribution, even when there is some similarity between the products. See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:51 (4th Ed.2000)." Miller's Ale House, Inc. v. Boynton

Carolina Ale House, LLC, 2009 WL 6812111, *13 (S.D. Fla. Oct. 13, 2009) (noting that the customer base was similar because both businesses were casual dining and drinking restaurants). "Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion….the parties' outlets and customer bases need not be identical, but some degree of overlap should be present…to support…confusion." Fla. Int'l, 830 F.3d at 1261.

Cellular South contends that its channels of trade and distribution "run the gamut" (direct selling, door to door, wholesale, retail, door to door, TV, radio, newspapers, online, banners, social media, direct mail, company vehicles, employee uniforms, customer invoices, signage at retail locations, signage at sponsorships (jumbotrons, ballparks, high school football), internet, social media, direct mailing (TR 33, 35-36, 39, 58, 64, 66)).  From this, Cellular South argues that because Spire delivers its products to its customers' homes and travels to those homes for servicing – like Cellular South does – then "the goods and services provided under the SPIRE Marks are, or would be, offered through at least some of the same, substantially similar, and/or overlapping channels of trade as those through which C Spire offers its goods and services….the goods and services provided under the SPIRE Marks are, or would be, offered to the same, substantially similar, and/or overlapping classes of consumers as those to which C Spire caters."  (Doc. 30 at 21).  Per Hayes, Cellular South consumers are defined as "all consumers from the time they are old enough to sign a contract" including individuals, businesses, government agencies, hospitals, etc.  TR 36 (Hayes). According to Hayes, "we are talking about marketing to the same consumers with same media and markets" and it does not matter how careful or sophisticated a consumer is because "when driving down the road at 55 mph and see a billboard…customers get confused" -- "people don't read advertising, they don't watch television commercials. They consume advertising in passing" such that it is "very very likely" given the same people, with the same media, the same message and near identical logos, consumers will be confused.  TR 98 (Hayes).  Cellular South contends that because it

and Spire will use or have used the same channels of advertising and sales – households and businesses and traditional sales channels -- this factor supports its claim.  TR II 226-227.

According to Spire, it has no retail stores where it sells its services to the public whereas Cellular South uses retail stores and faces retail store competition (e.g. AT&T, Verizon, etc.).  Spire also states it uses separate and distinct channels of sale for natural gas; natural gas customers encounter entirely different and distinct experiences (e.g., gas purchases cannot select from a long list of competing providers while telecommunications purchasers can); and natural gas customers are focused on heating/cooling options, not telecommunications, such that the class of customers is wholly distinct.  TR II 76-78, 80-82, 88-89, 166-170 (Willingham). Per Willingham, because Spire has no retail stores, customers have to call Spire or go to the website to become a client.  Moreover, Spire's marketing is geared towards natural gas being better than other energy sources (electric, coal, etc.). Spire also focuses it's marketing on safety and energy efficiency and the benefits to the community from using natural gas.  (Id.)

Cellular South's advertising and sales argument is based on a faulty premise -- that Cellular South and Spire are using the same available channels of advertising to compete against one another. Such is not the case. The businesses are in two different fields or sectors of the utilities market. Further, apart from stating its customers are homeowners and businesses, Cellular South has not shown how a cell phone or internet customer is similar to a natural gas customer.  In sum, while the "how" maybe similar (traditional avenues of advertising/media) and the where (Mississippi and Alabama) may become the same, the "what" is not the same.  This factor does not weigh in favor of Cellular South.

### 5.  Advertising Methods

Similarity of advertising methods is assessed by comparing the parties' advertisements and audiences reached.  Fla. Int'l, 830 F.3d at 1262-1263.  "The greater the similarity, the greater the

likelihood of confusion." Id. at 1262. The standard is not identical methods but "whether there is likely to be significant enough overlap in the [audience]…that a possibility of confusion could result." Id. at 1263. In short, "whether the…ads are likely to reach the same audience." Id.

As detailed *supra*, Cellular South advertises and promotes goods/services in many ways including via television, radio, advertising, print, direct mail, internet, etc., and contends that Spire "has used or intends to use the same advertising mediums and outlets[]" which weighs in favor of a likelihood of confusion.  (Doc. 30 at 22; Hrg. Ex. D-21 (Facebook add)).  According to Spire, while it may use the same or similar advertising method (TV, radio, mail, etc., see *supra*) its advertising is focused *on a different audience with a different message*: namely, encouraging business and/or residential consumers to switch from energy competitors (electric, coal, propane, etc.) to natural gas, and thus competing with providers of alternate forms of energy (i.e., not focused on a telecom consumer audience and not competing for telecom services).  The undersigned acknowledges that some of Spire's advertising campaign is similar to Cellular South's.  But, while both companies may use the same or similar advertising methods and styles, because the companies are not competitors in the telecom industry, they are necessarily communicating distinct and different advertising messages to different audiences.  This factor is neutral.

### 6. **Intent**

To establish intent, Cellular South has to show that Spire has a conscious intent to capitalize on its reputation/goodwill, is intentionally blind, or otherwise manifested improper intent in adopting its mark. Caliber, 605 F.3d at 940; Custom Mfg., 508 F.3d at 648.  Specifically, "[i]f it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity."…whether [the alleged infringer]…"had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent" in adopting its

new name and acronym."  <u>Fla. Int'l</u>, 830 F.3d at 1263.

Cellular South argues that a "side by side" comparison of the social media material Spire plans to use for marketing its gas companies (and rebranding), with that of Cellular South, "shows that Spire intends to free-ride on C Spire's name and goodwill[]" and that the timing of Spire's rebranding is "highly suspect[]" as it will happen in conjunction with the oncoming fall football season (at which time Cellular South does a great deal of advertising).  (Doc. 30 at 23).  Cellular South claims that Spire's advertising and the way the videos are presented "are deliberately or through their advertising agent copying" Cellular South because the videos are almost identical in message and tone.  TR II 227.  Cellular South adds that Spire's continuing to rebrand and expend money towards same, despite receiving a cease and desist letter, goes to intent.  TR II 227-228.

In response, Spire relies on Willingham's testimony, noting Spire's use of its mark since 2013 without challenge by anyone, much less Cellular South, until 2016.  Willingham testified that the intent in rebranding and renaming was to be completely different than anyone else; "we don't want the mark to be close to anyone else's mark," and that for example, Spire chose the color orange as it represents energy and no one in the energy arena was using orange.   TR II 114 (Willingham). Willingham testified that Laclede, which is a 180 year old gas company, ordered a number of trademark searches for the "spire" mark, starting back in September 2012, to identify any conflicts or possible confusion with other businesses – i.e., any trademarks already "out there" in Spire's business line (goods and services class of Spire) -- and no conflicts or confusion were found.  The results showed, however, immense use of "spire" in the world: over 150 current and active registrations, including 18 uses in Mississippi and 15 in Alabama.

Upon consideration, Cellular South has not submitted sufficient evidence that Spire intended to capitalize on its reputation/goodwill, is intentionally blind, or otherwise manifested improper intent in adopting its mark.  Cellular South's position is largely based on its unilateral interpretation of

Spire's advertising and its conclusions about it, rather than evidence.  Cellular South has provided no evidence to the Court of Spire's intention to take a "free ride on C Spire's name and goodwill."  In contrast, Spire, via Willingham's testimony, has established that Spire, over almost a decade, ordered a number of trademark searches and thoroughly researched the mark "spire," as it wished to be completely different than anyone else, to stand out, when it rebranded.  Such testimony undermines any "intent" by Spire to capitalize on C SPIRE. This factor does not weigh in favor of Cellular South.

### 7.   **Actual Confusion**

Evidence of actual confusion is the best evidence of a likelihood of confusion, and courts assess the existence and extent of any such confusion.  Fla. Int'l, 830 F.3d at 1264; Custom Mfg., 509 F.3d at 1360.  "[W]e must consider who was confused and how they were confused: 'Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, ... while confusion of actual customers of a business is worthy of substantial weight.' *Safeway Stores,* 675 F.2d at 1167; *see also Aronowitz*, 513 F.3d at 1239-40 ('With regard to actual confusion, we have specifically accorded 'substantial weight' to evidence that actual customers were confused by the use of a mark as opposed to other categories of people.')…..even two instances of actual confusion is 'worthy of some consideration' when the right people are confused in the right way. *See Safeway Stores*, 675 F.2d at 1167."  Fla. Int'l, 830 F.3d at 1264.  "The rule courts usually apply is that infringement occurs when "there is a likelihood of confusion in the mind[s] of an appreciable number of 'reasonably prudent' buyers." 2 J.T. McCarthy…§ 23:27, at 87–88." Harland 711 F.2d at 979 at n.22.

According to Hayes' (and Harper's) evidentiary hearing testimony, Cellular South's confusion contentions appear based to its "road map" and future plans to "own the home" -- linked to its recent registration application for home automation and security services (alarm services – alarm systems, $CO_2$ detectors, thermostats, garage door openers, lights, AC, door locks, lighting controls,

etc). TR 29-30 (Hayes); TR 134 (Harper).   Namely, that Cellular South has been significantly impacted by Comcast's Xfinity foray into the telecom and internet industry, while historically only cable, such that it is concerned about "other utility companies branding out into other areas"  TR 59. Per Hayes, "there's nothing to keep someone like Spire …from doing the same thing[]" and "[d]on't think its' a stretch at all" for a gas company like Spire to start selling telecommunication services[]" as "they could do it tomorrow if they wanted to."  TR 60.  Hayes' testimony appears to bring to the forefront Cellular South's primary concern.  However, said concern is not based on evidence.  In contradiction, Willingham testified that Spire has no plans to go into the telecom and internet business.  TR 75 (Willingham).

Cellular South admits that while it cannot show actual confusion, because there are no instances of both companies advertising in the footprint of Alabama and Mississippi (TR 99 (Hayes); TR II 228), the Court should still conclude that there is a *potential* for actual confusion based on Harper and Jacoby's findings.  According to Harper, her 2017 survey revealed that after viewing the company's logos, "just shy of 37%" of consumers were confused, thinking Spire was affiliated with Cellular South.  TR 113, 126-127, 130 (Harper).  In response to criticism that only the bare logos were shown to the participants, Harper stated that she could not place Spire "in context" because it was not yet in the marketplace and it is common to show a logo isolated (e.g., on a headset or jumbotron). TR 141-142 (Harper).  Harper also explained she did not want to show the logos as actually used presently by Spire (in other markets) because she did not want to assume Spire would use the same logo in the new market..  TR 141-142, 152-153 (Harper).  Harper also expresses her personal opinion that Spire may want to get into the telecom business some day, admitting she has not seen any evidence of this, but presuming that consumers "certainly believe they could all be part of the same utility company"  (citing 15-17% of people think a utility company could conceivable offer both services, per Dr. Jacoby).  TR 175-176 (Harper).

Moreover, Hayes testified that there might be confusion and inconvenience with customer call centers. She presented a "should anything happen" scenario (e.g., a catastrophe with Spire impacts the image of Cellular South – explosion, environmental lawsuits, etc.), and that customers might think Cellular South has rebranded or bought a gas company (brand instability) -- resulting in a loss of control of reputation, consumer trust and goodwill. TR 63, 67-68 (Hayes). However, Hayes submitted no evidence of this, just her opinion and speculation on the part of Cellular South. Hayes also acknowledged that Cellular South customers are careful and sophisticated "in terms of buying cellular service." TR 79-81 (Hayes).

In contrast, Spire asserts, via Dr. Jacoby's testimony, that Harper's opinion is "fatally flawed", such that it cannot provide support for Cellular South's claim. Specifically, Dr. Jacoby opines that Harper used the wrong universe (used Jr. mark customer base instead of Sr.'s base), the wrong stimuli (logos not shown in context), and the wrong protocols (did not use a control group to test results if actual mark not present). TR II 16, 20-22, 24, 28, 53-59 (Jacoby). Spire also relies upon Dr. Jacoby's finding that it is highly unlikely that any consumers seeking telecommunications services would call a natural gas company for telecommunications services. TR II 9, 12, 70 (Jacoby). Moreover, Spire also references its agreement with Chesapeake, owner of ASPIRE ENERGY mark, noting that this shows those companies could co-exist *even within the energy industry with the two marks* – suggesting the "spire" mark is highly diluted. TR II 236-237 (Hrg. Ex. D-11A).

Upon consideration, the Court finds that there is no evidence of *actual* confusion. <u>Delta Air Lines</u>, 2015 WL 11347586, *13 (finding "no evidence to support any actual customer confusion. Thus, this factors weighs in the....[non-movant's] favor[]"). As to *potential* confusion, there is primarily conjecture and speculation by Cellular South. At most, the evidence, per Dr. Jacoby, indicates that 15.3% of consumers thought a telecommunications business and a natural gas business could be associated. Association, however, is not *de facto* confusion, and Cellular South has not

established otherwise by the evidence.  This factor does not favor Cellular South.

**8.**      **Weighing of the seven (7) factors**

Upon consideration, the court has weighed the factors and concludes, on balance, that Cellular South has not shown a *substantial* likelihood of success on the merits for these counterclaims.

**B.**      **Alabama and Mississippi Trademark Dilution (Count IV)**

Cellular South asserts state law dilution counterclaims against Spire pursuant to Ala. Code § 8-12-17[9] and Miss. Code Ann. § 75-25-25, (Doc. 8 at 35), which are very similar.

At the outset, Spire asserts that Cellular South's state law dilution counterclaims are barred per 15 U.S.C. § 1125(c)(6), which states that "[t]he ownership by a person of a valid registration ... on the principal register under this chapter shall be a complete bar to" a state law dilution claim. Here, however, there appears to be a dispute between the parties as to the *validity* of the registration of the "spire" mark—as its registration is being contested.  As expressed in Lovetap, LLC v. CVS Health Corp., 2017 WL 3250374, *4 (N.D. Ga. Jul. 31, 2017) (emphasis added):

> Congress was clear, through the language it enacted into law, that it intended for § 1125(c)(6) to provide a complete bar to state dilution claims against valid registrations. *The inclusion of "valid," based upon the plain meaning of the word, necessarily means that § 1125(c)(6) does not apply to those federal registrations that are invalid.* As such, the Court finds that when there is a question as to the validity of a federally registered trademark, and a plaintiff seeks to cancel that trademark with a well-pleaded complaint, §1125(c)(6) does not mandate immediate dismissal of a plaintiff's related state claim for dilution.

The Court finds that as the validity of Spire's mark appears to be in question, immediate dismissal of the state law dilution claims, *at the preliminary injunction stage*, is not required.

Turning to the substantive state law dilution contentions, the Court finds as follows.  Both the

---

9 As explained in the Comments to the Alabama statute: "This section does not require that there be competition between the parties or confusion as to the source of the goods. The Alabama courts never addressed this issue directly. However, in one case which dealt with injunctive relief from alleged infringement of a trade name the court stated that all that was necessary to be shown was that the complainant's trade was in danger of harm from use of its name by the respondent in such a manner as is likely to deceive the public into belief that respondents' affairs are those of complainant. Thus to the extent that this language might imply a necessity of proof as to confusion as to the source of the goods, the section would be a modification of the Alabama law."

Mississippi and Alabama statutes provide that the owner of a mark "which is famous and distinctive, inherently or through acquired distinctiveness," is entitled to an injunction "against another person's commercial use of a mark, if such use begins after the famous mark has become famous and is likely to cause dilution of the famous mark[.]" <u>Ala</u>. <u>Code</u> § 8-12-17(a); <u>Miss</u>. <u>Code</u> <u>Ann</u>. § 75-25-25(a). Both statutes define a famous mark as, "widely recognized by the general consuming public of this state or a significant[] geographic area in this state as a designation of source of the goods or services or the business[] of the mark's owner." <u>Ala</u>. <u>Code</u> § 8-12-17(b); <u>Miss</u>. <u>Code</u> <u>Ann</u>. § 75-25-25(b). Both statutes share similar factors to determine whether a mark is famous: 1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark in this state[;]" 2) [t]he amount, volume, and geographic extent of sales offered under the mark in this state[;]" 3) "[t]he extent of actual recognition of the mark in this state or a significant geographic area in this state[;]" and 4) whether the mark is registered at the state or federal level. <u>Ala</u>. <u>Code</u> § 8-12-17(b)(1-4). <u>Miss</u>. <u>Code</u> <u>Ann</u>. § 75-25-25(b)(1-4).  Moreover, the statutes provide: "the owner of a famous mark shall be entitled to injunctive relief throughout the geographic area in which the mark is found to have become famous ***prior to*** commencement of the junior use, but not beyond the borders of this state." <u>Ala</u>. <u>Code</u> § 8-12-17(c) and <u>Miss</u>. <u>Code</u> <u>Ann</u>. § 75-25-25(c) (emphasis added).

To prevail on its Alabama state law dilution claims, Cellular South must show: 1) the C SPIRE mark is famous; 2) Spire adopted its mark *after* Cellular South's C SPIRE mark became famous; 3) Spire's mark diluted Cellular South's C SPIRE mark; and 4) Spire's use is commercial and in commerce.  <u>Alfa Corp.</u>, 560 F. Supp. 2d at 1176.  For Mississippi, courts consider: 1) degree of inherent or acquired distinctiveness of the mark in the state; 2) duration and extent of use of the mark in connection with the goods and services; 3) duration and extent of advertising and publicity of the mark in the state; 4) geographical extent of the trading area in which the mark is used; 5) channels of trade for the goods or services with which the owner's mark is used; 6) degree of recognition of the

owner's mark in its and in the other's trading areas and channels of trade in the state; and 7) nature and extent of use of the same or similar mark by third parties.  Montalto v. Viacom Int'l, Inc., 545 F.Supp.2d 556, 561 (S.D. Miss. 2008).

"[T]he plaintiff's burden of proof for dilution under § 8–12–17 ... [i]s essentially the same as under federal law." Alfa Corp., 560 F.Supp.2d at 1176.  A dilution action then, "is based on the concept that a strong trademark has value beyond its ability to distinguish a good or service's source[]" and it "protects the owners of such strong, distinctive marks from the diminution of consumer goodwill by competitors or non-competitors."  Id. at note 3.  As explained in Kaplan, 2009 WL 10668763, *7 (internal citations omitted):

> Trademark dilution occurs where companies produce different goods or services and where there is no likelihood of consumer confusion between the two marks…In this way, dilution claims are different from infringement claims. The theory of recovery for dilution claims is "that the public associates the same mark with two entities and that association infringes on the senior user's property right by preventing the mark to serve as a unique identify of the senior user alone." ... "A dilution action ... is based on the concept that a strong trademark has value beyond its ability to distinguish a good or service's source. A dilution action protects the owners of such strong, distinctive marks from the diminution of consumer good will by competitors or non-competitors."…. "Thus, dilution occurs where the trademark is blurred by the junior uses or where the junior use damages the good associations originally attributed to the senior use."….

> A party is entitled to injunctive relief if they own a famous mark that is distinctive and another entity uses that trademark or name in commerce causing blurring or tarnishing of the mark. 15 U.S.C. § 1125(c)(1). An owner of a famous mark can prevail on a dilution claim if the owner shows that the mark is famous and demonstrates the likelihood of confusion—a plaintiff need not show actual dilution. 15 U.S.C. § 1125(c)(1)….

And as explained in Alfa Corp., 560 F. Supp.2d at 1176-1177:

> To succeed on a trademark dilution claim, a plaintiff must prove "1) its mark is famous; 2) the defendant adopted its mark after the plaintiff's mark became famous; 3) the defendant's mark diluted the plaintiff's mark; and 4) the defendant's use is commercial and in commerce." ….The nonexclusive list of factors a court may consider to determine whether a mark is famous and, therefore, deserving of protection from dilution, include: (1) the degree of inherent or acquired distinctiveness; (2) the duration and extent of use of the mark; (3) the duration and extent of advertising and publicity; (4) the geographical extent of the area in which the mark is used; (5) the channels of trade in which the mark is used; (6) the degree of recognition of the mark in the areas and channels of trade used by the owner and the entity allegedly diluting the mark; and (7) the nature and extent of use of the same or similar marks

28

by third parties; and (8) whether the mark is registered on the principal register…..

*Cf.* EBSCO Indus., 89 F.Supp.2d at 1263 ("this court has used the five prong test for dilution [restated by the Second Circuit]…(1) the senior mark must be famous; (2) the senior mark must be distinctive; (3) the junior use must be a commercial use in commerce; (4) the junior use must begin after the senior mark has become famous and (5) the junior mark must cause dilution of the senior mark[]").

Spire contends that: 1) Cellular South's mark is not famous; 2) there are hundreds of other registrations for, and uses of, "spire", across a wide range of industries; 3) Spire's use of "spire" does not further dilute Cellular South's use of its mark, because the term "spire" is *already* diluted; and  4) Spire has been using the mark since December 2013.  TR 6, 90.  Cellular South, in contrast, argues that the marks are distinctive, strong and famous, and became so before Spire began to use or proposed to use the "spire" mark in virtually identical markets to advertise and sell its goods and services in Mississippi and Alabama ("since September 2011").

At the hearing, Cellular South presented the testimony of Hayes in support of its dilution claims to argue its mark is "famous" (or well-known) and was "famous" before Spire began using the "spire" mark.  Hayes testified to market studies, for the State of Mississippi, from March 2016 and June 2017 (Hrg. Ex. D-9 and D-10).  Hayes provided no evidence or testimony as to any market studies for the State of Alabama or any dilution in the state.  In doing so, Hayes testified that the Cellular South mark was famous, in Mississippi, as of those dates.  Cellular South acknowledges the many hundreds of other registrations or applications for marks using the word spire, but explains that "they are for other products."  TR 90 (Hayes).  In response, Spire presented evidence of its use of the mark in December 2013, more than two (2) years before the March 2016 market study in Mississippi upon which Cellular South relies.

As for Cellular South's Alabama dilution claim, no evidence has been submitted as to the C

SPIRE mark being "famous" in Alabama before Spire's first use of the "spire" mark in December 2013.  As such, Cellular South's injunctive request is denied as to this claim.

With regard to Cellular South's Mississippi dilution claim, the evidence Cellular South has submitted speaks to the C SPIRE mark being "famous" a number of years *after* Spire's first use of a *version* of the "spire" mark in December 2013.  TR. Ex. D-9 and D-10. In other words, the studies Cellular South has brought to the Court's attention provide no evidence of any *pre-existing* famous C SPIRE mark (i.e., the C SPIRE mark being famous *before* Spire's first use of this version of the "spire" mark in December 2013).  Other reference made by Cellular South to the C SPIRE mark's "famous" nature is vague in substance (e.g., IPhone testimony) and overall insufficient to establish the C SPIRE mark was famous before December 2013.

However, as to other versions of the "spire" mark, used during 2016, Cellular South has provided *some* evidence that the C SPIRE mark was famous at that time.  However, even assuming *arguendo* that the C SPIRE mark was famous in Mississippi as of March 2016, Cellular South still has to submit evidence showing that the public associates (or will likely associate) the same mark with <u>both</u> Cellular South and Spire, and that such association infringes on Cellular' South's rights "by preventing the mark to serve as a unique identify of the senior user alone."  Cellular South has to also show that the C SPIRE mark is blurred (or is likely to be blurred) by Spire's use of the "spire" mark. The Court has considered the testimony and evidence by Harper and Hayes, and on balance – and while close – finds that it cannot conclude that Cellular South has established a *substantial* likelihood of success on the merits for the Mississippi state law dilution counterclaims.

## C.    <u>Declaratory Judgment</u> (Count V)

Cellular South seeks a declaratory judgment finding that: 1) there is a likelihood of confusion among consumers as to the marks; 2) Spire's use of the marks has infringed or will infringe on the Cellular South marks; 3) Spire's use of the marks constitutes or will constitute unfair competition,

unfair trade practices, or deception; and 4) Spire's use of the marks has diluted or will dilute the Cellular South marks under Alabama and Mississippi law.  (Doc. 30 at 26).  Cellular South also requests that the Court enter an order denying registration of Spire's marks on the principal register pursuant to 15 U.S.C. § 1052(a) and (d), because Spire's mark "will confuse people into believing the goods and services" from Cellular South and Spire "emanate from the same source[;]" and Spire's use of the mark would "disparage and falsely suggest a connection with" Cellular South, "causing loss, damage or injury."  (Id.)  In contrast, according to Spire, Cellular South's declaratory judgment counterclaim merely duplicates the other counterclaims such that the same arguments for trademark infringement, unfair competition, dilution and state law claims, *supra*, apply to this claim.  (Doc. 43 at 24 at note 15).  Upon consideration, because the other counterclaims request the same relief sought in the declaratory judgment counterclaim, Cellular South's declaratory judgment does not appear to "serve a useful purpose." FairWarning IP, LLC v. CynergisTek, Inc., 2015 WL 5430355, *2 (M.D. Fla. Sept. 14, 2015); The Macknight Food Group, Inc. v. The Santa Barbara Smokehouse, Inc., 2015 WL 6380644, *2 (S.D. Fla. Oct. 22, 2015).  This counterclaim then, appears to be redundant of the other counterclaims for which preliminary injunctive relief is also sought.  Additionally, as for that portion of Cellular South's declaratory judgment counterclaim that seeks entry of an order denying Spire its registration of the marks, there is nothing presently to enjoin.  Cellular South has already filed an opposition to the registration in the USPTO and those proceedings have been suspended pending the litigation in this Court "wherein both parties have invoked this Court's authority to determine registrability, which will thus have a direct bearing on the outcome" of the USPTO action.  Thus, upon consideration, the Court finds that Cellular South has not met its burden of showing a substantial likelihood of success on the merits of its declaratory judgment counterclaim.

## V.     Irreparable Injury

At the outset, the undersigned is persuaded by eBay Inc. v. MercExchange, L.L.C., 547 U.S.

388 (2006) and <u>Winter v. Nat. Res. Def. Council, Inc</u>., 555 U.S. 7, 22 (2008) that a presumption of

irreparable harm does not attach in a trademark case.  Rather, a party seeking a preliminary injunction

must "demonstrate that irreparable injury is likely in the absence of an injunction." The Court follows

the rationale of <u>Uber Promotions, Inc. v. Urber Tech., Inc</u>., 162 F. Supp.2d 1253, 1261-1262 (N.D.

Fla. 2016):

> For years, the Eleventh Circuit (along with many other circuits) held that courts should "extend a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1227 (11th Cir.2008). The appropriateness of this presumption is doubtful, however, after the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388…..courts have applied its reasoning in the context of preliminary injunctions in trademark cases and concluded that the presumption of irreparable harm is no longer good law…..Other courts, while not going so far as to hold that the presumption of irreparable harm is no longer appropriate in trademark cases, have suggested that that is the correct (and inevitable, once the question is squarely presented) result….The Eleventh Circuit is in this latter group of courts, having stated in dicta that "a strong case can be made that *eBay's* holding necessarily extends to the grant of preliminary injunctions" in a trademark-infringement case. *Axiom Worldwide*, 522 F.3d at 1228…. This Court is persuaded by *eBay* that a presumption of irreparable harm is no longer appropriate in a trademark-infringement case once a substantial likelihood of success on the merits is shown…..The Lanham Act….provides that courts "shall have power to grant injunctions[] according to the principles of equity." 15 U.S.C. § 1116(a)…This does not suggest that irreparable harm should be presumed in a trademark infringement case, but instead indicates that the appropriateness of injunctive relief must be analyzed using the traditional framework. *See Ferring Pharm*., 765 F.3d at 215–17.

<u>See e.g., Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters</u>., 533 F.3d 1287, 1323

(11th Cir. 2008) (citing *Ebay* and stating an injunction "does not automatically issue upon a finding of

copyright infringement[,]" but instead a movant must satisfy the four (4) factors).

Turning to the "irreparable injury" factor, per <u>Parsons & Whittemore, Ent. Corp. v. Cello

Energy, LLC</u>, 2008 WL 227952, *23 (S.D. Ala. Jan. 25, 2008) (internal citation omitted):

> A plaintiff seeking a preliminary….injunction must show that the irreparable injury will occur "during the pendency of the suit" unless the preliminary injunction issues….In other words, the possibility that [movant]… will suffer an irreparable injury at some point after the conclusion of this case does not justify the issuance of a preliminary injunction-…[movant] must show that the injury will occur while this case is ongoing, before the parties and court can obtain a final decision on the merits.

Additionally, "'[a] showing of irreparable injury is the sine qua non of injunctive relief.'…[e]ven if…[movant] could establish a likelihood of success on the merits, the absence of a showing of irreparable injury, 'would, standing alone, make preliminary injunctive relief improper.'" Hoop Culture, Inc. v. GAP Inc., 648 Fed. Appx. 981, 984 (11th Cir. 2016).  Moreover, in trademark cases, grounds for irreparable injury may include loss of control of reputation, loss of trade, loss of customers, loss of goodwill and the possibility of confusion.  See, e.g., Ferrellgas Partners, L.P. v. Barrow, 143 Fed. Appx. 180, 190-191 (11th Cir. 2005); Jysk Bed'N Linen v. Dutta-Roy, 810 F.3d 767, 780 (11th Cir. 2015).

Cellular South has not persuaded the Court that it will suffer an irreparable injury during the pendency of this lawsuit unless a preliminary injunction issues.  Cellular South asserts it has established irreparable harm, or at the very least the imminent threat of irreparable harm via loss of control of its reputation, loss of goodwill, and the likelihood of confusion between the parties' marks. Cellular South relies heavily on Choice Hotels, 2016 WL 6652453 at *4-5, which states that "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods [and services]. Even if the infringer's products [and services] are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another."  From this, Cellular South argues that if Spire is allowed to rebrand Willmut, Alagascorp and Mobile Gas with the mark, it "will be at the mercy of Spire with regard to its ability to control the nature and quality of the goods and services[.]" (Doc. 30 at 28). Choice Hotels' concerned companies in the same field of goods and services – the hotel/motel business (a franchise and use of a mark). Cellular South and Spire do not produce/sell (or associate with) the same goods/services such that one would logically (or necessarily) "be at the mercy" of the nature and quality of the goods/services of the other, to be potentially "imperiled."

At best, Cellular South's evidence consists of speculation for harm to its reputation, goodwill

and business, with Spire's use of the mark – e.g., "risk of a gas leak," theoretical "negative customer experiences," "negative social posts" -- which it argues would then be incorrectly linked to, or associated with, Cellular South.  TR II 229.  Simultaneously, however, Cellular South repeatedly emphasizes the hundreds of millions of dollars and thousands of hours it has invested to "earn brand trust, not just of its customers, but also its communities[,]" and that it has taken years of creating and delivering a customer experience linked to the company's name.  (Doc. 30 at 28-29; TR II 229).  The Court finds it incongruous for Cellular South to argue how famous and well known its name is and how vested it is with its customers and communities as a trusted brand, yet to simultaneously ask the Court to conclude that Spire's use of a mark – in a different industry, with a different business, selling/providing different goods/services – is on the verge of causing the imminent loss or destruction of all of those dollars and work hours unless an immediate injunction issues.

Additionally, as Spire correctly highlights, Cellular South's ability to establish irreparable injury is diminished by its own delay in seeking injunctive relief.  (Doc. 33 at 2-3).  Cellular South explains the delay due to the injury not being "ripe" and the harm not being "immediate" until the receipt of Spire's July 27, 2017 rebranding filing with the Mississippi Public Service Commission. (Doc. 44).  Cellular South claims that until then, the harm was "only a possibility and was not imminent." (Doc. 44 at 2).  Cellular South asserts: "Spire's earlier conduct did not put" it on "notice of an imminent threat of irreparable harm[,]" and that in the months after the March 24, 2016 name change announcement "there was no evidence that Spire would move forward on its rebranding efforts." (Doc. 44 at 3).  On August 21, 2017, Cellular South restated its position another way: "[u]ntil now…to its "knowledge" -- Spire's use of the mark ("if at all") was limited to two service stations (propane or gas refueling stations) in Missouri and South Carolina (outside its footprint), and it was only when it was notified of Spire's plan to rebrand in its "footprint" in August 2017, that it sought injunctive relief.  (Id. at 4; Tr. at 8).  Given the evidence submitted, the Court is not

34

persuaded.

On June 20, 2014, the Spire mark was registered by Laclede in the USPTO.  The evidence reveals that Cellular South has had knowledge of Spire's plans to rebrand its businesses since (the latest) March 28, 2016, when Cellular South issued a cease and desist letter to Spire, stating that Spire's use of the mark had caused, was causing and will cause immediate injury.  The letter addressed Spire's alleged "infringement and dilution" of Cellular South's trademarks as Cellular South "recently became aware" of the Laclede Group's March 24, 2016 announcement that it was changing its name to Spire.  Cellular South wrote that use of the mark by Spire "infringes on C Spire's trademarks and may dilute its marks in violation of the federal and state trademark law[,]" demanding that Spire "immediately cease and desist from using its Spire marks[]" as such use "will subject your company to injunctive relief, actual damages, disgorgement of profits, costs and attorneys' fees."  (Hr. Ex. P-R).  Cellular South added that "use of the Spire marks may cause, has caused and/or is causing damage" to its business and reputation.  (Id. at 2).  On April 1, 2016, Spire denied Cellular South's allegations and stated that its rebranding would continue.  (Hr. Ex. P-I).

In 2016, Spire's registration was pending before the USPTO and on April 27, 2016 (and as amended on June 27, 2016 and August 1, 2016), Cellular South filed an Opposition "based on reported public comments by" Spire, that Spire "will change the names" of its businesses (e.g., Mobile Gas, Willmut Gas, etc.) to Spire following acquisition.  Spire repeatedly restated its rebranding plans to Cellular South and in filings with the USPTO. As explained at the hearing, on April 28, 2016, Spire's shareholders committed to the rebrand publicly and the next day changed the NYSE ticker symbol to Spire.  As of August 2016, all of Laclede's year-end financials were Spire and the company had become Spire nationally.  TR 5; TR II 239.  Late Summer 2016, the annual report announced the company is Spire.  TR II 239. Spire also notified Cellular South of a rebranding timeline with its February 21, 2017 Responses to Cellular South's Interrogatories filed in the USPTO.

(Doc. 43-14 at 3).  "Spire, Inc. is a holding company, and its operating subsidiaries are *in the process of rebranding to the SPIRE marks.* The rebranding is currently expected to be *completed by the end of 2017*."  (Id. (emphasis added)).  Spire also included its rebranding plans in the documents provided in response to Cellular South's requests for production filed in the USPTO.  And on June 14, 2017, Spire filed this federal action, stating: "Spire *currently* uses the SPIRE marks in promoting, offering and rendering its natural gas marketing and natural gas fueling related services in Alabama, Mississippi, Missouri and South Carolina. Spire will begin using the SPIRE marks in promoting, offering and rendering natural gas distribution services in Alabama, Mississippi and Missouri in *September 2017*."  (Doc. 1 at 8 at ¶24 (emphasis added)).  On July 27, 2017, Cellular South received materials that Spire provided to the Mississippi Public Service Commission related to its rebranding (with a timeline).  On August 14, 2017, Cellular South moved for injunctive relief.  (Doc. 30).

Faced with this rebranding history, Cellular South asks the Court to disregard its March 28, 2016 letter as evidence of its awareness of Spire's rebranding.  Cellular South claims it lacked knowledge – *at that time* -- of a "rebranding timeline" and when, and whether definitively, Spire would actually rebrand, such that any injury was only a possibility and not imminent.  The presence of the March 2016 letter indicates that Cellular South thought the harm or injury was actual or imminent *at that time*, not prospective, potential or possible, yet failed to seek injunctive relief. (Doc. 44 at 4). And even if the Court disregards the letter, *and* Cellular South's statements in same, *and* presumes a rebranding timeline was somehow necessary for Cellular South to act, the fact remains that as of February 21, 2017, Spire notified Cellular South that it was *already* rebranding and that the process would *finish* by the end of 2017.[10]

In sum, Cellular South has provided insufficient explanation as to why it waited until August 14, 2017 to seek injunctive relief.  Cellular South's delay -- whether a few months or 18 months –

---

10 Spire continued to include a rebranding timeline in documents thereafter (e.g., 6/14/17 complaint filed in this case referencing rebranding "in September 2017" (Doc. 1 at ¶ 24)).

militates against a finding of irreparable harm pending trial, and undercuts any sense of urgency. Wreal, LLC v. Amazon.com, Inc., 2015 WL 12550932, *2 and 16-17 and notes 19-20 (S.D. Fla. Feb. 3, 2015).  See also Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248-1249 (11th Cir. 2016) (discussing a delay of only a few months and stating "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits.…a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm[]"); 27-24 Tavern Corp. v. Dutch Kills Centraal, 2015 WL 5772158, *21 (E.D.N.Y. Sept. 29, 2015) ("Plaintiff filed an intent-to-use application with the USPTO.…plaintiff has offered no explanation for why it delayed filing this application for four months after it issued its cease and desist letter, and then waited another full month to file the instant action…the Court is compelled to find that plaintiff's unexplained delay of five months undercuts its claim of irreparable harm[]"); Kensington Partners v. Cordillera Ranch, Ltd., 1998 WL 1782540 *11-13 (W.D. Tex. Jun. 16, 1998) (no urgency for injunctive relief and no substantial threat of irreparable harm given 10-month delay between cease-and-desist letter and filing of motion); Interactive Media Corp. v. Imation Corp., 2012 WL 4058064, *1 (D. Mass. Sept. 13, 2012) (delay of almost two years between cease and desist letter and injunctive motion suggests no urgency and no irreparable injury).

**VI.    Balance of Harms**

        For this factor, the inquiry is whether "the probable loss of consumer goodwill [to Cellular South]…..outweighs the cost of delay" to Spire, who will be unable to sell its product using the trademark until a decision is reached on the merits. Davidoff & Cie, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001).  Cellular South bears the burden of showing the threatened injury outweighs whatever damage an injunction may cause to Spire.  Id. at 1300.

        Cellular South asserts: "though the Willmut, Mobile Gas, and Alagasco websites feature a

note regarding the planned name change, to date, the company names, websites, and billing materials of Willmut, Mobile Gas and Alagasco have not yet been changed. Spire will suffer little, if any, harm by having to continue to use those names until this matter is resolved on the merits. Customers who are already using the services of Willmut, Mobile Gas and Alagasco will likely continue to do so, and will not be affected by a name change." (Doc. 30 at 29; TR at 9). Cellular South adds that the renaming of these three (3) companies is set to go forward on September 1, 2017, and that is why the threat is imminent. TR at 9. Cellular South notes that since it began its rebranding of Cellular South to C SPIRE in September 2011, it has spent $12.8 million on the rebrand and mass media with the new name C SPIRE and since 2011 has spent about $275 million on the brand as a whole, while Spire has only spent about $3 million. TR 15-17, 19 (Hayes); TR II 233. Cellular South adds further that its ability to get and keep customers will be impacted by Spire's use of the mark, especially if there are environmental issues, gas leaks, explosions, etc., as that would cause substantial damage to the reputation and goodwill it spend hundreds of millions to secure and will be impossible to get back. TR 70-71 (Hayes). Cellular South adds that any monetary damage to Spire is 'self-inflicted" as it should have stopped rebranding upon receipt of the March 28, 2016 cease and desists letter. Id.

According to Spire, it will be substantially harmed and damaged because it has *already* invested significant resources ($3,480,000 to develop the brand and $14 million in expression of the new brand) which has been ongoing since March 2016, and will incur additional and unnecessary costs if it is now forced to completely change or remove such rebranding; will suffer damage to its business reputation; will impact its subsidiaries' long-term supply contracts for the rebranded equipment (uniforms, vehicles, etc. worth millions); will impact its customer communications (as they have already been informed about the rebranding via bill inserts, social media, websites, etc.); and the intangible cost via a loss of trust, customer confidence and goodwill, is extremely high in an industry in which safety is an essential component (natural gas). TR II 135-138 (Willingham).

Specifically, Willingham testified to all the resources that have been or are being rebranded with Spire and which will be impacted: building signage, website, customer connect portals, loss of the master brand, email addresses, business cards, name badges, thousands of shirts, pants, uniforms, etc. Id.  Additionally, September 25, 2017 is first day employees wear Spire uniforms -- all been distributed already in preparation for this "go orange day." Id.  The nationwide website changed in April 2016 and business cards, access cards, buildings, etched class, welcome mats and trucks have already changed. Id.

Moreover, Willingham testified about the master brand strategy with safety as paramount, core of what Spire does, such that the customer has to be confident and "trust us." Id.  In that regard, Spire has been communicating with the public, its employees, and the world since 3/24/16 via email, bill insert, etc. that they were becoming Spire. Id.  Per Willingham, "now we are the point that it's all done[]" so if it does not happen, significant trust issue will emerge and "make people question what other things you say you will do won't you[]" Id.

Upon consideration, the Court finds the balance of harms weighs in favor of Spire.  This is not a situation in which a trademark dispute is on the verge of happening or is only just now impacting Cellular South.  Spire *already* has been operating under the Spire mark since December 2013, for natural gas vehicle fueling services.  (Doc. 1 at 6; TR at 5).  On June 20, 2014, the SPIRE mark was registered in the USPTO (a valid and subsisting mark *which has not been challenged by Cellular South* in the USPTO).  (Doc. 1 at 6-7; TR at 5, 7).  Spire has been publicly and formally engaged in rebranding its operations with the SPIRE marks *since 2016,* and Cellular South has been aware of this since (at least) the March 28, 2016 cease and desist letter.  Spire disputed Cellular South's trademark allegations in response and notified Cellular South on April 1, 2016 that the rebranding process would continue.  Before filing the present action on June 14, 2017, Spire had "already commenced" the rebranding of Alabama Gas Corporation and Mobile Gas "subsidiaries and operations under its

SPIRE trademarks[]" and asserted that it "currently uses the SPIRE marks in promoting, offering and rendering its natural gas marketing and natural gas fueling related services in Alabama, Mississippi, Missouri and South Carolina. Spire will begin using the SPIRE marks in promoting, offering and rendering natural gas distribution services in Alabama, Mississippi and Missouri in September 2017." (Doc. 1 at 5 at ¶15 and 8 at ¶24)).  Through the present date, Spire has *already* committed millions of dollars, time, energy, resources, secured new inventory, uniforms, advertising, signage, etc., for rebranding. See, *e.g.* Alltel Corp., 42 F.Supp.2d at 1274 (discussing facts related to a company's "considerable investment in its name").  Further, Spire's business in that of natural gas with safety as a paramount concern, and the trust and reliability of its customers is thus critical given the nature of the business. TR II 240. A loss of customer confidence, if the new name and rebranding were suddenly changed, would be harmful.  Id.

In comparison, Cellular South's injury would be an alleged loss of reputation and goodwill due to an *assumed* likelihood of confusion of the products.  As explained *supra,* Cellular South has not made a convincing case (yet) on this argument. Also, any potential injury to Cellular South appears minimal "given the current lack of overlap in competition" with Spire. Alltel Corp., 42 F.Supp.2d at 1274; HBP, Inc., 290 F.Supp.2d at 1332, 1334-1335 (discussing cases finding no confusion as the trademarks were for products sold in different industries).

**VII.   Public Interest**

Courts consider whether issuance of an injunction will serve the public interest. Winter, 555 U.S. at 20; Wreal, 840 F.3d at 1247; Alltel Corp., 42 F. Supp.2d 1265.  This factor concerns the public's right not to be deceived or confused – i.e., preventing or avoiding unnecessary consumer confusion in the marketplace. Davidoff, 263 F.3d at 1304.

Cellular South contends that with Spire's use of the mark, there is a high likelihood that the public will be confused as to the source and origin of its telecommunications goods/services with

those of the gas companies; confused customers will be inconvenienced and waste time and have a negative experience by accidentally calling Spire's customer service when they intend to call Cellular South; and unique dangers to the public exist as such confused customers will call Cellular South to report natural gas leaks/explosions.  (Doc. 30 at 30; TR II 233; TR 62-63 (Hayes)).

Upon consideration, Cellular South has not provided sufficient evidence that entry of an injunction will serve the public interest (that the public's right not to be deceived or confused customer is at risk by Spire's use of the mark). At best, the evidence before the Court indicates that the public interest factor is neutral.

## VIII.   Conclusion

Based upon the foregoing, and while close, Cellular South has not met its high burden[11] such that it is **ORDERED** that Cellular South, Inc.'s Rule 65 motion for preliminary injunction (Docs. 29, 30) is **DENIED**; and Cellular South's Alabama common law unfair competition claim is **DISMISSED** as a matter of law.

**DONE** and **ORDERED** this the **11th** day of **September 2017.**

/s/ Kristi K. DuBose
**KRISTI K. DUBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

11 See, e.g., Revette v. International Assn. of Bridge, Structural and Ornamental Iron Workers, 740 F.2d 892, 893 (11th Cir. 1984) ("Although there may be merit to these contentions, they present a sufficiently close question so that the district court could probably have gone either way in its decision to a preliminary injunction. In such a case, there can be no abuse of discretion"); Stockstill v. City of Picayune, 2017 WL 3037431, *10-11 (S.D. Miss. Jul. 18, 2017) ("But at the end of the day, a close question, in the Court's view, means that the plaintiff has not shown a substantial likelihood of success on the merits, which is the high burden he must carry at a preliminary injunction hearing. And, of course, the Court expresses no view about what the ultimate resolution of the case might be"); Acumen Enterp. v. Morgan, 2011 WL 1227781, *2 (N.D. Tex Mar. 29, 2011) ("Although the parties appear to have similar appreciation for the term, that appreciation does not necessarily mean that Defendant was 'cybersquatting' on a domain name that Plaintiff would eventually seek to purchase. This question is close enough that a jury could rule for or against Plaintiff. Thus, Plaintiff has not even shown that more likely than not a jury would rule in its favor, much less that a substantial likelihood of success on the merits exists"); Gordon v. Holder, 721 F.3d 638, 645 at note 4 (D.C. Cir. 2013)  ("we merely conclude that the questions they raise are too close to call at this stage"); The Sandusky Cty. Dem. Party v. Blackwell, 340 F.Supp.2d 810, 813 (N.D. Ohio 2004) "(the question of likelihood of success is somewhat closer. Reasonable judges might reach different conclusions on this question....The mere possibility of a different result on a close question is not, however, a substantial likelihood of success on the merits[]"); Adkins v. Jones, 2007 WL 397044 (W.D. Mich. Feb. 1, 2007) ("Plaintiff's 'initial burden' in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits… plaintiff has not established a substantial likelihood of success on his claim…this issue presents a close question, and plaintiff may ultimately succeed on this issue. However, plaintiff has not established a substantial likelihood of success at this time[]").